[No. 62872-1-I. Division One. February 7, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. EMIR BESKURT ET AL., *Defendants*, TANER TARHAN, *Appellant*.

*Steven Witchley* (of *Ellis Holmes & Witchley PLLC*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney,* and *Randi J. Austell, Deputy,* for respondent.

¶1 Cox, J. — Taner Tarhan appeals his conviction for rape in the third degree. The conviction arose from a group sexual encounter with H.W. that involved Taner and three

other defendants.[1] All defendants were jointly prosecuted and tried together before a jury.

¶2 Taner primarily argues on appeal that we should reverse his conviction and grant him a new trial because the trial court sealed preliminary juror questionnaires used during voir dire of the venire without first conducting a *Bone-Club* analysis.[2] We hold that there was no violation of Taner's constitutional right to a public trial. But because the trial court sealed the questionnaires without first conducting the required analysis, we remand for a *Bone-Club* hearing and reconsideration of the sealing order.

¶3 Taner's remaining claims on appeal are primarily based on arguments that this court previously addressed in the opinion disposing of the appeals of his co-defendants. Because the reasoning in that opinion applies to this case, we reject Taner's remaining claims in this appeal.

¶4 In June 2007, 20-year-old H.W. and her friends, Caroline Concepcion and Spencer Crilly, were relaxing at the women's apartment building in the Capitol Hill neighborhood of Seattle. They planned to make dinner and have a few drinks. While cooking in their kitchen, H.W. and Concepcion looked out the window and saw their male neighbors one floor below. The women waved and gestured for the men to come join them. A few minutes later, Emil Beskurt, Turgut Tarhan, and Samet Bideratan arrived at H.W.'s apartment. Taner, Turgut Tarhan's twin brother, joined the group later.

¶5 The men introduced themselves, and H.W. learned that they were visiting from Turkey on student visas. After a few minutes of chatting and drinking beer, the group

---

[1] Because of the common surname of the defendant twin brothers, Turgut Tarhan and Taner Tarhan, we adopt Taner's naming convention in his briefing on appeal. The use of "Taner" to identify Taner Tarhan is also consistent with the naming convention used in this court's prior opinion regarding the appeal of the other three defendants. That opinion, *State v. Beskurt*, was filed on July 6, 2010, and is noted at 156 Wn. App. 1045, 2010 WL 2670826, 2010 Wash. App. LEXIS 1403.

[2] *See State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

agreed to go to the apartment downstairs, where Beskurt lived. Crilly, who had an intimate dating relationship with H.W., declined to join the group.

¶6 Everyone continued to socialize. H.W. chatted with the four men while sitting on the futon in Beskurt's living room. At some point, Concepcion slipped out to go to the store. H.W. did not notice her leaving.

¶7 During Concepcion's absence from the apartment, Beskurt, Bideratan, Turgut, and Taner all had sexual intercourse with H.W. At trial, she testified that she did not consent to sexual intercourse with any of the men.

¶8 The State charged all four men with rape in the second degree, contrary to RCW 9A.44.050(1)(a).[3] They were tried jointly before a jury.

¶9 Prior to commencing jury selection, the parties stipulated and the court agreed that the members of the venire would complete a confidential questionnaire that included questions concerning their sexual histories. After the answers were made available to counsel, they questioned the members of the venire in open court. Thereafter, all parties selected the jury, and then accepted the jury as constituted.

¶10 Following the selection, acceptance, and swearing of the jury, the court entered an order sealing the completed questionnaires. That order, entered on July 8, 2008, states:

> The court having reviewed the applicant's motion and declaration to seal specific documents or this file, and pursuant to applicable case law and court rules, finds compelling circumstances to grant the order exist as follows:
>
> Jurors signed confidential questionnaires containing private information concerning sexual abuse with the understanding that the questionnaires would be sealed.[4]

Despite the wording in the typed first paragraph of this order, there is nothing in the record showing that any party

---

[3] RCW 9A.44.050(1)(a) states, "A person is guilty of rape in the second degree when . . . the person engages in sexual intercourse with another person . . . [b]y forcible compulsion."

[4] Clerk's Papers at 119.

moved to seal the questionnaires. It is undisputed that the trial court did not hold a *Bone-Club* hearing before entering this sealing order.

¶11 A jury convicted Taner of the lesser included offense of rape in the third degree, contrary to RCW 9A.44.060(1)(a).[5] The court sentenced all defendants to 10 months confinement and 36 to 48 months of community custody.[6]

¶12 Taner appeals.

## OPEN AND PUBLIC TRIAL

 ¶13 Taner argues that the trial judge violated his right to an "open and public" trial by sealing preliminary juror questionnaires without first conducting a *Bone-Club* analysis on the record.[7] We hold that there was no violation of his right to a public trial. But the trial court's failure to conduct a *Bone-Club* hearing before sealing the questionnaires is inconsistent with the public's right of open access to court records. Accordingly, remand for reconsideration of the sealing order at such a hearing is required.

¶14 An accused's right to a public trial is protected by both the state and federal constitutions. The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."[8] Similarly, article I, section 22 of the Washington Constitution provides, "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury."

---

[5] RCW 9A.44.060(1)(a) states, "A person is guilty of rape in the third degree when . . . such person engages in sexual intercourse with another person, not married to the perpetrator . . . [w]here the victim did not consent . . . to sexual intercourse with the perpetrator and such lack of consent was clearly expressed by the victim's words or conduct."

[6] The State properly concedes a sentencing error, which the trial court corrected by modifying the judgments and sentences of all defendants during the pendency of this appeal. Clerk's Papers at 1288-89.

[7] Appellant's Opening Brief at 28.

[8] U.S. CONST. amend. VI.

¶15 Article I, section 10 of the Washington Constitution also provides that "[j]ustice in all cases shall be administered openly." This provision has been interpreted as protecting the right of the public and the press to open and accessible court proceedings, similar to the public's right under the First Amendment.[9]

These [respective constitutional] provisions "assure a fair trial, foster public understanding and trust in the judicial system, and give judges the check of public scrutiny." The guaranty of open criminal proceedings extends to jury selection, which is important " 'not simply to the adversaries but to the criminal justice system.' "[10]

¶16 In *Bone-Club*, the Washington Supreme Court set out the standards for closing all or any portion of a criminal trial.[11] The court adopted a five-part analysis that applies to protect both the public's right under article I, section 10, and the defendant's right under article I, section 22:

"1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.

"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

"4. The court must weigh the competing interests of the proponent of closure and the public.

---

[9] *State v. Easterling*, 157 Wn.2d 167, 174, 179, 137 P.3d 825 (2006) (citing *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 7, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)).

[10] *State v. Coleman*, 151 Wn. App. 614, 620, 214 P.3d 158 (2009) (quoting *State v. Duckett*, 141 Wn. App. 797, 803, 173 P.3d 948 (2007); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 804, 100 P.3d 291 (2004) (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 505, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984))).

[11] 128 Wn.2d at 258-59.

"5. The order must be no broader in its application or duration than necessary to serve its purpose."[12]

In *State v. Waldon*,[13] this court held the same analysis applies to the sealing of court documents.[14]

¶17 If this court determines that the defendant's right to a fair public trial has been violated, it devises a remedy appropriate to that violation.[15] If the error is structural in nature, automatic reversal of the conviction and remand for a new trial are required.[16] An error is structural when it " 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' "[17] However, in each case the "remedy must be appropriate to the violation."[18]

¶18 Whether a defendant's right to a public trial has been violated is a question of law, subject to de novo review.[19]

¶19 Here, Taner argues that the sealing of the jury questionnaires violated his public trial right under article I, section 22.[20] But he also cites to article I, section 10, which generally requires public access to court records, in support of his claim.[21]

---

[12] *Id.* (alteration in original) (quoting *Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)).

[13] 148 Wn. App. 952, 202 P.3d 325, *review denied*, 166 Wn.2d 1026 (2009).

[14] *Id.* at 967.

[15] *State v. Momah*, 167 Wn.2d 140, 149, 217 P.3d 321 (2009), *cert. denied*, 131 S. Ct. 160 (2010).

[16] *Id.*

[17] *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Washington v. Recuenco*, 548 U.S. 212, 218-19, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)).

[18] *Id.* at 150, 155-56.

[19] *State v. Strode*, 167 Wn.2d 222, 225, 217 P.3d 310 (2009).

[20] Appellant's Opening Brief at 29.

[21] *Id.* at 40.

¶20 This court addressed the question of whether sealing of juror questionnaires violated these two constitutional provisions in *State v. Coleman*.[22] That case was a prosecution for rape and multiple counts of first degree child molestation that allegedly involved a nine-year-old.[23] The members of the venire completed questionnaires that included matters concerning their sexual histories.[24] Once the completed questionnaires were provided to counsel, selection of the jury proceeded in open court.[25] The parties accepted the jury, as constituted, and the court swore the jury.[26]

¶21 Three days after the jury was sworn, the court ordered the questionnaires sealed, finding:

> The court finds compelling circumstances for sealing the documents indicated below:

> Jury questionnaires containing personal sexual history of prospective jurors related to issues in this case. The individual juror's right to privacy in this information greatly outweighs the public's right to access the court files.[27]

The court did not hold a *Bone-Club* hearing to consider whether sealing was proper and appears to have ordered sealing on its own motion.[28] The jury convicted Coleman of two counts of molestation, acquitted him of a third, and failed to reach a verdict on the rape charge.[29]

¶22 On appeal, Coleman argued that the trial court's failure to undertake a *Bone-Club* analysis before entering its sealing order violated both "his right and that of the

---

[22] 151 Wn. App. 614, 621, 214 P.3d 158 (2009).

[23] *Id.* at 617-18.

[24] *Id.* at 618.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.* at 618-19.

[29] *Id.* at 618.

public to an open and public trial."[30] He further claimed that these violations constituted structural error, requiring a new trial.

¶23 This court concluded that the failure to conduct a *Bone-Club* analysis prior to sealing the juror questionnaires did not violate Coleman's right to a public trial under article I, section 22.[31] Rather, this court held that the failure to conduct that analysis violated the public's right to open and accessible court proceedings under article I, section 10 of the state constitution.[32]

¶24 This court reasoned:

> Under these authorities, the court should have conducted a *Bone-Club* analysis before sealing the questionnaires. ***Violation of the public's right to open court records requires remand for reconsideration of the order.***
>
> Coleman contends that sealing the questionnaires without conducting the *Bone-Club* analysis amounted to structural error, from which prejudice is presumed and for which a new trial is warranted. On these facts, we do not agree that structural error occurred. The questionnaires were used only for selection of the jury, which proceeded in open court. The questionnaires were not sealed until several days after the jury was seated and sworn. Unlike answers given verbally in closed courtrooms, there is nothing to indicate that the questionnaires were not available for public inspection during the jury selection process. ***Thus, the subsequent sealing order had no effect on Coleman's public trial right, and did not "create 'defect[s] affecting the framework within which the trial proceeds.'"***
>
> The error was not structural.[33]

---

[30] *Id.* at 619.

[31] *Id.* at 623-24.

[32] *Id.*

[33] *Id.* (emphasis added) (alteration in original) (footnotes omitted) (quoting *In re Det. of Kistenmacher*, 163 Wn.2d 166, 185, 178 P.3d 949 (2008) (Sanders, J., concurring in part) (quoting *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999))).

¶25 The facts of this case are substantially similar to those in *Coleman*. Taner fails to point to any part of this record in which jury selection was not held in open court.

¶26 More importantly, he fails to point to anything in this record to show that the completed questionnaires were used for anything other than jury selection, which proceeded in open court. Thus, he fails to show any factual distinction between this case and *Coleman* respecting this factor.

¶27 In *Coleman*, the trial court entered the sealing order days after the parties accepted the jury, as constituted. Here, the same is true. All parties accepted the jury on July 2, 2008, six days before the court entered the order sealing the questionnaires. Taner fails to identify any reason to distinguish this case from *Coleman* based on this factor.

¶28 Taner attempts to distinguish Coleman solely on the basis of the third factor that this court discussed in that case: whether the questionnaires were available to the public during voir dire of the venire. He chiefly relies on the following colloquy between the court and counsel for support:

THE COURT: . . . Now, I know that counsel want to have more opportunity to look at the [completed] questionnaires, but I'm very reluctant to have them leave the courtroom, and so I'm wondering if we give you some time after court today and tomorrow morning, if that would work.

[THE PROSECUTOR]: Your Honor, I have an interview scheduled at 4:00, and another interview scheduled at 5:00.

THE COURT: That's not going to help you.

[THE PROSECUTOR]: No, that doesn't help me. If the court—certainly it's easier for me to do this than it is for the other attorneys, I could certainly assure the court they wouldn't be taken out of the courthouse and would simply be in the prosecutor's office, but I recognize that doesn't help any of these four gentlemen, so it had been my hope, in all honesty, to have some time to sort of spread everything out on the table and compare the yellow questionnaires with questionnaires that the court did, a lot of information to synthesize in a short amount of time. I understand the court's concerns, but—

THE COURT: Let me hear from some of defense counsel.

[DEFENSE COUNSEL]: Not much more to add, except that I had an opportunity down at the Regional Justice Center to go through a questionnaire case three weeks ago . . . where we also had a questionnaire and the opportunity to have a lot of information, and I think it's important for all the lawyers, and I know you can trust us that we'll bring it all back to you and it will be in exactly the same condition, without even the staples being removed, so I would also like to have the opportunity to have the information.

THE COURT: Well, there is an awful lot here. You can imagine why I'm nervous about having [the questionnaires] leave the courthouse. The thing is I know all of you, and I also—you are very experienced attorneys and I think you recognize what a disaster it would be if people thought that their information was going to be Xeroxed and sent around town.

Because you're officers of the court and I have such respect for all of you, I will let you take it home tonight, and that, I think, will allow us to be more efficient tomorrow.[34]

¶29 Read in context, this exchange shows that Taner had full access to the questionnaires prior to the sealing order. Whether this exchange evidences either an express or de facto sealing, contrary to the right of public access to court documents, is at issue. Also, at issue is whether any claimed error is "structural," requiring a new trial.[35]

¶30 It is unclear from this record whether the court's comments, read in context, represented a decision to deny public access to the completed questionnaires during voir

---

[34] Report of Proceedings (June 23, 2008) at 118-19.

[35] The United States Supreme Court has identified a limited list of trial errors in criminal cases as not being subject to harmless error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). Such "structural" errors include total deprivation of the right to counsel at trial, *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); a judge was not impartial, *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927); unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez v. Hillery*, 474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986); the right to self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984); and the right to a public trial, *Waller v. Georgia*, 467 U.S. 39, 49 n.9, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984).

dire. What the exchange does show is that the court recognized that the jurors filled out the questionnaires with the expectation that their answers would be confidential. The court expressed concern about sending copies of the questionnaires out of the courtroom with five different attorneys. The court's remark that the questionnaires not get "Xeroxed and sent around town" reflects this concern.

¶31 No one broached the subject of public access to the questionnaires during this colloquy. We do not suggest that the failure to raise the issue constituted a waiver of the claim on appeal. Likewise, it did not diminish the responsibility of the court to protect the constitutional safeguards that are before us. Nevertheless, on this limited record, we will not speculate on how the court would have ruled had anyone mentioned the question of public access to these questionnaires. In sum, this colloquy between court and counsel tells us little if anything about whether the questionnaires were unavailable to the public during voir dire of the venire in the following days of jury selection.

¶32 We also note that this record is silent on where these questionnaires were located during the selection of the jury following this colloquy. This is a fact that would be important to any determination of whether the public had access to them. Yet, Taner fails to point to anything in this record to fill this void.

¶33 In short, on this record, Taner fails in his burden to show that the questionnaires were unavailable for public inspection during jury selection.[36] This is fatal to his claim that the court violated his public trial right. As in *Coleman*, the trial court's failure in this case to conduct a *Bone-Club* analysis prior to entering the sealing order did not violate Taner's article I, section 22 right to a public trial. Taner's attempts to distinguish that case are unpersuasive.

[36] We need not decide whether Taner has standing to raise the public's right of public access to court records. He focuses his arguments on article I, section 22, the public trial right, not article I, section 10, the right to public access to court records.

¶34 Taner next argues that *Coleman* appears to suggest—without explicitly stating—that the violation in that case was de minimis, not structural.[37] We do not read that case to make any such suggestion. The supreme court has consistently rejected such characterizations of constitutional violations.[38] Nothing in *Coleman* departs from that guidance.

¶35 He next argues that *Coleman* was overruled sub silentio by *State v. Strode*[39] and *State v. Momah*.[40] We disagree.

¶36 In both of those cases, the supreme court decided that the trial court either expressly or implicitly closed the courtroom by conducting a portion of voir dire in chambers.[41] A plurality of the supreme court concluded in *Strode* that " 'full courtroom closure during jury selection' " must be preceded by the " '*Bone-Club* analysis; failure to do so results in violation of the defendant's public trial rights.' "[42] Addressing the appropriate remedy, the court in *Strode* held that "denial of the public trial right is deemed to be a structural error and prejudice is necessarily presumed."[43] "[T]herefore, Strode's convictions are reversed and the case is remanded for a new trial."[44] Two justices concurred in that result, writing separately in doing so.

¶37 Likewise, in *Momah*, the supreme court held that a trial court must undertake the *Bone-Club* analysis prior to a de facto closing of the courtroom during voir dire.[45] But in

---

[37] Appellant's Opening Brief at 40-41.

[38] *See Strode*, 167 Wn.2d at 230-31.

[39] 167 Wn.2d 222, 217 P.3d 310 (2009).

[40] 167 Wn.2d 140, 217 P.3d 321 (2009).

[41] *Strode*, 167 Wn.2d at 223-24; *Momah*, 167 Wn.2d at 145-46.

[42] *Strode*, 167 Wn.2d at 228 (quoting *State v. Brightman*, 155 Wn.2d 506, 515-16, 122 P.3d 150 (2005)).

[43] *Id.* at 231.

[44] *Id.*

[45] *Momah*, 167 Wn.2d at 149-50.

*Momah*, the supreme court concluded that there was no structural error because the trial court weighed the appropriate factors on the record prior to closing the courtroom, effectively engaging in a *Bone-Club* analysis.[46]

¶38 In our view, neither *Strode*, a plurality decision, nor *Momah* overrules *Coleman*.[47] First, neither case addresses the issue here: whether sealing juror questionnaires without first conducting a *Bone-Club* analysis violates a defendant's right to a public trial under article I, section 22 or the Sixth Amendment. Rather, both deal with the factually distinguishable issue of whether such an analysis must be done before closing the courtroom for voir dire.

¶39 Second, neither case addresses the appropriate remedy where a court errs by failing to conduct the *Bone-Club* analysis prior to sealing juror questionnaires. Thus, the remedy for an article I, section 10 violation, rather than an article I, section 22 violation, was not at issue in either case, as it is here.

¶40 Finally, *Strode* and *Momah* recognize that a defendant should not receive a new trial where his right to a public trial has been safeguarded,[48] or where this would be a "windfall" remedy.[49] This is consistent with the holding in *Coleman*. In *Coleman*, this court recognized that there is no easy distinction between juror questionnaires as part of open court proceedings and juror questionnaires as court records. Nevertheless, this court concluded that Coleman had not demonstrated that sealing juror questionnaires after jury selection was complete rendered his trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. In short, there was no structural error.

---

[46] *Id.* at 155-56.

[47] *Coleman* was decided on August 17, 2009, just under two months prior to *Strode* and *Momah*, which were decided on October 8, 2009. *Coleman* was not the subject of a petition for review, but *In re Detention of Townsend*, noted at 157 Wn. App. 1039, 2010 WL 3221940, 2010 Wash. App. LEXIS 1879, which follows *Coleman*, is the subject of a currently pending petition for review.

[48] *Strode*, 167 Wn.2d at 236 (Fairhurst, J., concurring).

[49] *Momah*, 167 Wn.2d at 150.

¶41 We conclude that the holding in *Coleman* is not inconsistent with subsequent supreme court authority. Taner has failed to show any violation of his public trial right under article I, section 22 or the Sixth Amendment.

¶42 After *Coleman*, there can be no serious dispute that the trial court in this case erred by failing to conduct a *Bone-Club* hearing before entering its sealing order under the public's article I, section 10 right to open court proceedings. Thus, the question is what remedy is appropriate for this error. We conclude that the appropriate remedy here is remand for the trial court to conduct a *Bone-Club* hearing and to reconsider its closing order.

¶43 Further, we conclude that remand for reconsideration of the sealing order is consistent with other relevant case law. For example, *Coleman* relies on *Waldon*. There, the trial court granted Waldon's motion to seal her court record based on the legal standard articulated in General Rule (GR) 15 rather than the five-part constitutional test articulated in *Seattle Times Co. v. Ishikawa*.[50] This court reversed, concluding that GR 15 must be read in harmony with the five-factor constitutional test.[51] Because the trial court applied the incorrect legal standard in reaching its decision to seal the court record, this court determined that the correct remedy was to remand for the trial court to reconsider the motion to seal under the correct legal standard.[52]

¶44 Likewise, this remedy is also consistent with *Ishikawa*, a supreme court case that held that the trial court erred, among other things, in sealing the record from a hearing without first analyzing the five factors outlined by the court.[53] The trial court also erred in failing to address these factors prior to denying the motions of two

---

[50] 97 Wn.2d 30, 640 P.2d 716 (1982); *Waldon*, 148 Wn. App. at 955-56 (citing *Ishikawa*, 97 Wn.2d 30).

[51] *Waldon*, 148 Wn. App. at 966.

[52] *Id.* at 957, 967.

[53] *Ishikawa*, 97 Wn.2d at 42-46.

regional newspapers to unseal the records from the hearing.[54] Significantly, the supreme court remanded the matter to the trial court to reconsider the newspapers' motions to unseal the records in accordance with the articulated standard.[55] No more severe remedy was imposed in that case. While *Ishikawa* was a civil case, it nonetheless provides guidance that we believe is helpful in this criminal case.

¶45 Finally, in *Waller v. Georgia*,[56] after concluding that the trial court erred in closing a pretrial suppression hearing to the public,[57] the United States Supreme Court remanded for a new suppression hearing.[58] The court concluded that a new trial was required only if the new suppression hearing resulted in suppression of material evidence not suppressed at the first, closed hearing.[59]

¶46 In sum, on this record, there was no violation of Taner's right to a public trial. Nevertheless, the trial court erred by sealing the juror questionnaires without first conducting the required *Bone-Club* analysis. That error was not structural. Thus, the appropriate remedy is to remand this case for reconsideration of the sealing order in light of *Bone-Club* and other relevant authority.

¶47 We remand for reconsideration of the sealing order and affirm in all other respects.

¶48 The balance of this opinion has no precedential value. Accordingly, pursuant to RCW 2.06.040, it shall not be published.

LEACH, A.C.J., and ELLINGTON, J., concur.

Review granted at 172 Wn.2d 1013 (2011).

---

[54] *Id.*

[55] *Id.* at 45-46.

[56] 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984).

[57] *Id.* at 48-49.

[58] *Id.*

[59] *Id.*