FILED
COURT OF APPEALS
DIVISION II

2014 MAR 13 AM 10: 17

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43359-1-II |
| Respondent, | |
| v. | |
| DAVID WILLIAM CARSON, | PUBLISHED OPINION |
| Appellant. | |

HUNT, J. — David William Carson appeals his jury trial convictions for three counts of first degree child molestation. He argues that (1) the trial court violated his right to a unanimous jury verdict by failing to provide a *Petrich*[1] unanimity instruction, (2) his trial counsel provided ineffective assistance in successfully opposing the trial court's giving a *Petrich* unanimity instruction, and (3) the trial court violated his right to a public trial by sealing the jury questionnaires without a *Bone-Club*[2] hearing. In a Statement of Additional Grounds for Review (SAG), Carson further asserts that (1) inconsistent testimony during the child hearsay hearing

---

[1] *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *overruled on other grounds by State v. Kitchen*, 110 Wn.2d 403, 405-06, 756 P.2d 105 (1988).

[2] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

and the jury trial unfairly prejudiced him; and (2) there was another "David" whom the victim mentioned in the child forensic interview, which suggests that Carson was not the perpetrator. We hold that defense counsel's objection to a *Petrich* jury instruction, if error, was invited and that it did not constitute ineffective assistance of counsel. We affirm.

## FACTS

### I. CHILD MOLESTATION

In 2009, David William Carson moved in with his friend DH, DH's fiancé—TH, and their three children—C, M, and five-year-old CC.[3] In exchange for housing, Carson paid $250 a month in rent, gave the family part of his food stamp allowance, performed household chores, and watched the children while DH and TH worked.

In August 2010, TH was driving the children to a friend's house when CC repeatedly tried to get her attention. When TH responded, CC told her that Carson had "tried to put his penis in his [CC's] butt"[4] and that once Carson had put "string"[5] on his hands and tape on his mouth. TH stopped the car and called DH; she called the police when she arrived at her friend's house. After speaking with a police officer, TH scheduled a forensic interview for CC.

---

[3] To provide some confidentiality in this case, we use initials in the body of the opinion to identify the victim, victim's family members, and other juveniles.

[4] 2 Report of Proceedings (RP) at 164.

[5] 2 RP at 168. TH testified that the "string" CC refers to is a "zip-tie" of the type they used to fix a recliner in their home.

On August 26, CC met with Cornelia Thomas, a forensic interviewer at Mary Bridge Child Advocacy Center. During the interview, CC referred to Carson's[6] penis as "business" but clarified that "business" meant "penis" by pointing to his private parts when Thomas asked him to show her what "business" meant.[7] CC detailed three occasions when Carson had tried to put his "business" in CC's bottom[8]: (1) when Carson tied CCs hands and put duct tape on his mouth in TH's room, (2) when Carson made CC look at a Spiderman blanket in CC's bedroom, and (3) when Carson twisted CC's "business" in the bathroom.[9]

Michele Breland, a nurse at Mary Bridge Children's Hospital, later performed a medical examination on CC, during which CC told her that Carson had tried to punch CC, had put his "business in [CC's] bottom," and had twisted CC's penis. 4 Report of Proceedings (RP) at 389. The physical examination results were inconclusive about whether CC's condition was indicative of sexual assault.

---

[6] CC initially referred to Carson as his "uncle." When Thomas asked what CC's uncle's name was, CC replied it was "David" and clarified that he had another uncle, "Mulkins," who "doesn't do nothin' to me, he tried fights with me on Halo games." Pierce County Superior Court, Wash., Forensic Interview, *State v. Carson*, No. 10-1-04754-1, (Aug. 26, 2010), *digital video recording by* Mary Bridge Child Advocacy Center (on file with Wash. Court of Appeals, Div. II, No. 43349-1-II) (Ex. 5), at 13 min., 56 sec.—13 min., 57 sec.

[7] Pierce County Superior Court, Wash., Forensic Interview, Ex. 5, *supra*, at 13 min., 55 sec.—14 min., 3 sec.

[8] In response to Thomas's question about when Carson put his penis in CC's bottom, CC initially mentioned a fourth incident—in CC's "new house." Pierce County Superior Court, Wash., Forensic Interview, Ex. 5, *supra*, at 13 min, 58 sec, 14 min, 12 sec. CC did not, however, provide any detail about this fourth instance.

[9] Pierce County Superior Court, Wash., Forensic Interview, Ex. 5, *supra*, at 13 min, 58 sec, 13 min., 55 sec.; 13 min., 59 sec.; 14 min., 3 sec.; 14 min., 19 sec.

Pierce County Sheriff's Department Detective Thomas Catey investigated the alleged abuse of CC. Carson voluntarily met Catey at the sheriff's office and told Catey that (1) he had moved out of DH and TH's home after DH accused him of sleeping with TH, and (2) he believed DH and TH had fabricated CC's molestation story in retaliation for leaving their home and placing them in a financial bind.

## II. PROCEDURE

The State charged Carson with three counts of first degree child molestation. Carson requested a jury trial.

### A. Child Hearsay Hearing; Voir Dire

CC's mother, TH, testified at a pretrial child hearsay hearing to determine the admissibility of CC's statements to her the first time CC told her about Carson. She related CC's statements that Carson had tried to sodomize him and had once had taped CC's mouth and tied his hands. The trial court later ruled these child hearsay statements admissible.

After the jurors filled out questionnaires, the trial court conducted voir dire. Based on the completed questionnaires, both counsel decided which jurors to excuse and which jurors to question individually.[10]

### B. Trial Testimony

At trial, CC identified Carson as "Uncle David," who had lived with his (CC's) family. 2 RP at 103. CC testified that Carson had touched his (CC's) bottom with his (Carson's)

---

[10] The parties did not designate the jury voir dire as part of the record on appeal. Thus, the record before us fails to show that voir dire did not occur in open court.

"business"[11] in DH's office, "where his computer games are"[12]; in CC's room; in the bathroom; in his mother's room; and in his dad's "old room"; CC also described an incident in his mother's room when Carson had tied CC's hands with plastic strings and put duct tape on CC's mouth. On cross-examination, CC testified that he did not remember Carson having touched his (CC's) "business" at all.[13] 2 RP at 126.

TH testified that (1) Carson lived with her family during the summer of 2009 and took care of the children while she and DH worked; (2) the day before Memorial Day weekend 2010, Carson moved out after an argument with DH; (3) on August 13, 2010, CC told her "that David tried to put his penis in his [CC's] butt,"[14] after putting "string"[15] on CC's hands and tape on his mouth; and (4) after that day, CC did not want to get dressed in front of family members, stopped leaving the restroom door open, and became more aggressive. Detective Catey testified that Carson told him he had moved out of TH's home after DH accused him of sleeping with TH, denied any sexual contact with CC, and believed DH and TH had fabricated CC's molestation story in retaliation for his leaving them in a financial bind.

---

[11] CC clarified that "business" is "[s]omething that you use to go to the bathroom" and that he did not know any other name for "business." 2 RP at 105. CC testified that Carson's "business" never went inside his bottom. 2 RP at 111.

[12] 2 RP at 109.

[13] Much of CC's trial testimony was inconsistent and confusing.

[14] 2 RP at 164.

[15] 2 RP at 168.

Child forensic interviewer Thomas testified that she had recorded her August 26, 2010 interview with CC approximately two weeks after CC's disclosure to TH. During this interview, CC disclosed a twisting of his "business" (which he later identified as a penis by pointing to that area of his body); a time when he was duct taped, had his hands tied with plastic string, and had a penis "going into his bottom"; and identified Carson as the perpetrator. 3 RP at 218. The trial court admitted into evidence CC's hearsay statements to Thomas and the DVD (digital video disk) recording of this interview, which Thomas had labeled with her initials; the jury viewed this DVD during trial.

Carson testified that he had known DH since 1996 and had moved in with DH and TH in 2009 after Carson had an altercation with his brother. Carson mentioned an agreement that he would pay TH and DH rent, give them $150 of his food stamps, and watch the children. Carson also mentioned that DH owned pornography and that he (Carson) had caught CC watching pornography once. Carson further testified that in May 2010, DH accused him of sleeping with TH, which prompted Carson to move out, which then upset DH and TH because they had no one to watch their children. Carson denied bathing the children, helping CC in the bathroom, touching CC's penis, tying up CC, or having access to zip-ties.

Mary Bridge Children's Hospital nurse Breland testified that when she performed a physical examination of CC on August 26, 2010, CC had asked her whether she was going to check his "business" (pointing to his penis) and told her that Carson had tried to punch him and put "his business in [CC's] bottom," which made him feel like he had to "poop," and that Carson had tried to twist CC's "business." 4 RP at 390, 389, 391. Breland found no sign of trauma and nothing unusual on CC's penis and testicles; his anus appeared normal. Based on CC's physical

6

examination, Breland could not conclusively say that CC's condition was indicative of sexual assault.

C. Jury Instructions

The trial court and counsel discussed whether to give a *Petrich* jury instruction. The State had included in its proposed jury instructions the following *Petrich* instruction:

> . . . To convict the defendant on any count of Child Molestation in the First Degree, one particular act of Child Molestation in the First Degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of Child Molestation in the First Degree.

Clerk's Papers (CP) at 38 (Jury Instruction 3).

Carson's counsel, however, explained that he had purposefully not proposed a *Petrich* instruction because he did not think one was necessary for the three separate and distinct incidents at hand. Instead, he believed that (1) a *Petrich* instruction was required only when the child talks about five or six incidents and just one is charged; and (2) more importantly, a *Petrich* instruction would confuse the jury. The next day, Carson's counsel reiterated that he had deliberately omitted a *Petrich* instruction from his proposed instructions because he saw no need for one and a *Petrich* instruction "becomes a problem" because it would "confuse the heck out of this jury" and potentially mislead the jury. 4 RP at 405, 406.

When the trial court asked Carson's counsel if he was objecting to giving a *Petrich* instruction, he responded in the affirmative. When the trial court asked if Carson's counsel objected to WPIC[16] 4.25 (the "*Petrich* instruction"), he replied, "I think it's confusing, yes." 4

---

[16] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.25, at 110 (3d. ed. 2008) (WPIC).

RP at 408. The trial court then asked whether Carson's counsel thought it would be error to give a *Petrich* instruction, to which he responded, "I do." 4 RP at 409. Based on defense counsel's strong, repeated objections, the trial court did not give the jury a *Petrich* instruction.

The trial court did, however, instruct the jury that its verdict must be unanimous:

> As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict. Each of you must decide the case for yourself, but only after you consider the evidence impartially with your fellow jurors. During your deliberations, you should not hesitate to re-examine your own views and to change your opinion based upon further review of the evidence and these instructions. You should not, however, surrender your honest belief about the value or significance of evidence solely because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of reaching a verdict.

CP at 72 (Jury Instruction 12). The trial court further instructed the jury: "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." CP at 63 (Jury Instruction 3).

The trial court also gave the jury a separate "to convict" instruction for each of the three charged counts, listing the following elements of child molestation that the State needed to prove beyond a reasonable doubt:

> To convict the defendant of the crime of child molestation in the first degree as charged in Count I, [II, III] each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That between the dates of April 1, 2009, and May 31, 2010, the defendant had sexual contact with C.C.;
> (2) That C.C. was less than twelve years old at the time of the sexual contact and was not married to the defendant and not in a state registered domestic partnership with the defendant;
> (3) That C.C. was at least thirty-six months younger than the defendant; and
> (4) That this act occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence you have reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 67, 68, 69 (Jury Instructions 7, 8, 9).

### D. Closing Arguments; Verdict

During closing argument, the State focused on the evidence and distinguishing characteristics of three distinct acts of child molestation that occurred on three different dates at three separate locations: (1) the incident in the bathroom when Carson twisted CC's "business," (2) the incident in TH's room when Carson tied CC's hands and placed tape over his mouth, and (3) the incident in CC's bedroom when Carson placed his penis in CC's anus while making CC look at a Spiderman blanket. 4 RP at 427-30. The State also explained to the jury that despite the evidence of several acts, it was asking the jury to focus on only three specific acts: Carson's twisting of CC's penis as the first act and the incidents in TH's room and CC's bedroom as the second and third acts:

> [STATE]: . . . The allegations in this case are that the defendant placed his hand and twisted, according to [CC], his penis *on one occasion* while he was in the bathroom. . . .
> [. . . .]
> . . . [CC], you'll remember, described several different times the defendant tried to put his penis in his bottom: In his room, in his mom's room, in the office. He described several different occasions.
> Some he was able to describe with greater specificity than others, and *there's two that the State is focusing on and would like you to focus on for purposes of your deliberations,* one that occurred in his room, and the instant one that I'm referring to right now that occurred allegedly in his mother's room.

4 RP at 424, 428 (emphasis added).

During Carson's closing argument, his counsel noted the State's burden to prove its case beyond a reasonable doubt; Carson's learning disability and his resultant susceptibility to TH and

9

DH's taking advantage of him; their coaching CC to accuse Carson of molestation, in revenge for leaving them in a financial bind without a babysitter, household servant, and rent and food contributor; and the weak merely circumstantial evidence of molestation. In support of his argument to the jury to acquit, counsel stressed CC's convoluted, contradictory, and "jumbled mess" of "confusing" statements during the forensic interview and at trial. 4 RP at 454. During deliberations, the jury followed defense counsel's closing argument suggestion and asked to review the DVD of Thomas's forensic interview of CC, during which he had told her about the same three molestation incidents on which the State had focused during its closing argument. The jury found Carson guilty of all three counts. He appeals.

## ANALYSIS

### I. SEALED JURY QUESTIONNAIRES

Carson first argues that the trial court violated his right to a public trial by sealing the jury questionnaires without first conducting a courtroom-closure analysis under *Bone-Club*. As Carson correctly notes in his reply brief, our Supreme Court recently held that the trial court's sealing of juror questionnaires without a *Bone-Club* analysis does not violate a defendant's public trial rights. *See* Reply Br. of Appellant at 3 (citing *State v. Beskurt*, 176 Wn.2d 441, 447, 293 P.3d 1159 (2013)). Finding *Beskurt* dispositive,[17] we do not further address this issue.

---

[17] As in *Beskurt*, the jury here completed the questionnaires before voir dire. Moreover, trial counsel did not use the questionnaires as a substitute for voir dire, but instead used them as a "screening tool." *See Beskurt*, 176 Wn.2d at 447.

## II. *PETRICH* INSTRUCTION

Carson next challenges the trial court's failure to give a *Petrich* instruction on two grounds—(1) such failure was reversible error, and (2) his defense counsel rendered ineffective assistance in objecting to the trial court's proposed giving such instruction. We hold that the invited error doctrine bars Carson's first challenge. *See State v. Kyllo*, 166 Wn. 2d 856, 861-62, 215 P.3d 177 (2009). With respect to his second challenge, we hold that Carson fails to show deficient performance and, therefore, fails to meet the test for ineffective assistance of counsel.

### A. Invited Error

Carson first argues that the trial court violated his constitutional right to unanimous jury verdicts by failing to give a *Petrich* instruction.[18] The State responds that (1) a *Petrich* instruction was not necessary because the prosecutor elected for the jury's consideration three distinct acts to support the three separate counts of child molestation, and (2) Carson invited the error when he objected and asked the trial court not to give a *Petrich* instruction. We hold that because Carson invited this claimed error, he cannot raise it on appeal.

The invited error doctrine is a strict rule that precludes a criminal defendant from seeking appellate review of an error he helped create, even when the alleged error involves constitutional rights. *State v. Studd*, 137 Wn.2d 533, 546-47, 973 P.2d 1049 (1999); *State v. Henderson*, 114

---

[18] In *Petrich* our Supreme Court held,

> When the evidence indicates that several distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct, jury unanimity must be protected. . . . The State may, in its discretion, elect the act upon which it will rely for conviction. . . . When the State chooses not to elect, this jury instruction must be given to ensure the jury's understanding of the unanimity requirement.

*Petrich*, 101 Wn.2d at 572.

Wn.2d 867, 870–71, 792 P.2d 514 (1990) (citing *State v. Boyer*, 91 Wn.2d 342, 344-45, 588 P.2d 1151 (1979)). This doctrine applies to alleged failures to provide a *Petrich* unanimity jury instruction. For example, in *State v. Corbett*, 158 Wn. App. 576, 592, 242 P.3d 52 (2010), we held that where the defendant proposed jury instructions that did not include a *Petrich* instruction, the invited error doctrine precluded him from challenging on appeal for the first time the trial court's failure to provide a *Petrich* unanimity instruction:

> . . . Corbett argues that the trial court failed to instruct the jury that it must find separate and distinct acts supporting each count and enter unanimous verdicts based on these separate and distinct acts. Corbett requests that we vacate three of his [four] convictions on this ground. But Corbett proposed the jury instructions he now seeks to challenge[.] Accordingly, Corbett invited any error.

*Corbett*, 158 Wn. App. at 591-92 (citing *State v. Phelps*, 113 Wn. App. 347, 353, 57 P.3d 624 (2002); *Henderson*, 114 Wn.2d at 870-71).

Carson more overtly invited omission of a *Petrich* instruction than did Corbett: Corbett simply failed to include a *Petrich* instruction with his proposed instructions. *Corbett*, 158 Wn. App. at 585-86, 591. But Carson deliberately omitted a *Petrich* instruction from his proposed jury instructions and then repeatedly and strenuously opposed the trial court's plan to give a *Petrich* instruction, as the following colloquy illustrates:

> [THE COURT]: My understanding is both sides have put together packets of instructions, and the only difference is whether or not Washington Pattern Instruction 4.25, WPIC 4.25, sometimes called the "[*Petrich*] instruction," can be given.
>
> [CARSON'S COUNSEL]: I left it out of mine, Your Honor, and I'll explain to the Court why. I think I did off the record.
>
> . . . .
>
> So because we have multiple counts here, to me, this child's testimony was a muddled mess, . . . we still have multiple counts, and I think the [*Petrich*] instruction wasn't designed for that. Obviously, Your Honor is going to make the

final decision, but I wanted to give you and the State the reason why I didn't put it in there.

. . . .

[THE COURT]: So you're objecting to giving the [*Petrich*] instruction, Mr. Sepe?

[CARSON'S COUNSEL]: I am for the reasons that I indicated. . . . I looked at [*Petrich*] and I looked at the comments that indicate, as I read it, that it should only be used where you're alleging one count but multiple acts. Here, we're not doing that. I didn't feel it was needed.

[THE COURT]: You're objecting to 4.25?

[CARSON'S COUNSEL]: I think it's confusing, yes.

[THE COURT]: You think it would be error to give 4.25?

[CARSON'S COUNSEL]: I do.

4 RP at 404-09. After the trial court sustained Carson's counsel's objection and withdrew the *Petrich* instruction from the stack it was going to read to the jury, the trial court again inquired:

[THE COURT]: Mr. Sepe, any objections or exceptions?

[CARSON'S COUNSEL]: We have no objections to the instructions [to be] given by the Court or the failure to give any instruction of the defense.

[THE COURT]: And the defense was opposed to giving the [*Petrich*] instruction.

[CARSON'S COUNSEL]: We were, and I think we made a clear record as to why we didn't think it was necessary.

4 RP at 410. Because Carson affirmatively opposed the trial court's giving the jury a *Petrich* unanimity instruction, the invited error doctrine precludes his claiming this as error on appeal.

13

## B. Effective Assistance of Counsel

Carson next argues that his trial counsel rendered ineffective assistance in that his objection to the trial court's giving a *Petrich* instruction constituted deficient representation and the trial court's resultant failure to provide this instruction was "'presumed to result in prejudice.'" Br. of Appellant at 19 (quoting *State v. Coleman*, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007)). The State counters that defense counsel's objection to the proposed *Petrich* instruction was legitimate trial strategy and that Carson failed to demonstrate prejudice. Br. of Resp't at 10, 13. We hold that defense counsel's objection to the proposed *Petrich* instruction was legitimate trial strategy, not deficient performance, and thus not ineffective assistance of counsel.

### 1. Standard of review

To prevail on an ineffective assistance of counsel claim, a defendant must show both deficient performance and resulting prejudice; failure to show either prong defeats such claim. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). Because Carson fails to satisfy the deficient performance prong, we do not address the second, prejudice prong of the test. *McNeal*, 145 Wn.2d at 362.

We review an ineffective assistance claim de novo, beginning with a strong presumption that trial counsel's performance was adequate and reasonable and giving exceptional deference when evaluating counsel's strategic decisions. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (citing *Kyllo*, 166 Wn.2d at 862), *adhered to in part on remand*, 168 Wn. App. 635, 278 P.3d

225 (2012). Thus, to establish deficient performance, a defendant must show that counsel's performance fell below an objective standard of reasonableness. *McNeal*, 145 Wn.2d at 362.

Given the deference we afford defense counsel's decisions in the course of representation, the threshold for deficient performance is high. *Grier*, 171 Wn.2d at 33. There is a strong presumption that counsel has rendered adequate assistance and has made all significant decisions by exercising reasonable professional judgment. *State v. Lord*, 117 Wn.2d 829, 883, 822 P.2d 177 (1991). Thus, "[w]hen counsel's conduct can be categorized as legitimate trial strategy or tactics, performance is not deficient."[19] *Kyllo*, 166 Wn.2d at 863. Generally, legitimate trial strategy cannot serve as the basis for a claim of ineffective assistance of counsel. *Lord*, 117 Wn.2d at 883. Such is the case here.

### 2. Performance not deficient

Carson fails to show that his counsel's performance was deficient. We disagree with him and the dissent that defense counsel declined the *Petrich* instruction under a mistaken belief that this instruction was unnecessary. On the contrary, the record shows that Carson's counsel (1) had carefully and strategically considered whether it was in his client's best interest for the trial court to give the jury a *Petrich* instruction, and (2) decided to oppose giving the *Petrich* instruction to avoid confusing the jury (not simply, as Carson asserts for the first time on appeal, because he was under a mistaken belief about the law). Defense counsel's tactical decision to avoid jury confusion was legitimate trial strategy—a general credibility attack on the victim's

---

[19] A criminal defendant can rebut the presumption of reasonable performance by showing that his counsel's representation was unreasonable under prevailing professional norms and that there is "no conceivable legitimate tactic" that explains counsel's performance. *Grier*, 171 Wn.2d at 33 (citations omitted). Again, such is not the case here.

"muddled mess"[20] of coached testimony advanced by defense counsel's strenuous argument to the trial court that giving the *Petrich* instruction would result in the very evil that such an instruction is normally intended to prevent—jury confusion.

The following colloquy about the proposed jury instructions demonstrates this focal point of counsel's trial strategy:

> [CARSON'S COUNSEL]: I left [the *Petrich* instruction] out of [my proposed instructions], Your Honor, and I'll explain to the Court why. . . .
>
> Generally, when you read the comments to the [*Petrich*] instruction, it doesn't apply, as I understand it, to multi-count cases because *the way it's read could confuse the jury*. Normally it's when you have one count but you have like six possible acts that could have accounted for.
>
> Say, for example, hypothetically the State charged him with one count of child molestation and yet the child describes perhaps an incident in one bedroom, something in an office, and something in another bedroom. The jury, under [*Petrich*], would have to decide which of those one acts unanimously do they agree on to support the charge beyond a reasonable doubt.
>
> It becomes a problem when you have multiple counts because look what it says in the second sentence: "*To convict the defendant on any count of child molestation, one particular act of child molestation in the first degree must be proved beyond a reasonable doubt.*"
>
> The reason that comment is there and even though the jury is given Instruction 3.01, that each count is to be considered by you separately and your verdict on one doesn't affect your verdict on the other, the reason that they give you that little warning under the comment is *to avoid the possibility that, well, if you find that he committed one act, then he must have committed all the counts.*

---

[20] 4 RP at 406.

*So I elected,* when reading the comment, when reading and looking at this case, *saying we're going to confuse the heck out of this jury and there's a possibility they could be misled into thinking that this means to convict him on any count, they must agree on, at least, one act.*[21]

4 RP at 404-06 (emphasis added).

When the trial court sought to clarify that defense counsel objected to giving the *Petrich* instruction, counsel reiterated his trial strategy, again focusing on the confusion it would cause for the jury and asserting it would be error to give such instruction in this case:

> [THE COURT]: So you're objecting to giving the [*Petrich*] instruction, Mr. Sepe?
>
> [CARSON'S COUNSEL]: I am for the reasons that I indicated. I believe there's one count and you have multiple alleged acts. When you have something like this, if you look at—although this child's testimony was muddled, inconsistent and confusing as heck, and the tape wasn't much better, there seems to be something that happened in his bedroom, something that happened involving twisting "the business" in the bathroom, maybe, or an office, depending on which version you believe, something that appears to may have happened in his mother's room. So when I looked at that, I said, well, there's three somewhat distinct acts here, albeit confusing. And I looked at [*Petrich*] and I looked at the comments that indicate, as I read it, that it should only be used where you're alleging one count but multiple acts. Here, we're not doing that. I didn't feel it was needed.
>
> [THE COURT]: You're objecting to 4.25?
>
> [CARSON'S COUNSEL]: *I think it's confusing, yes.*

---

[21] Counsel also argued:
> So because we have multiple counts here, to me, this child's testimony was a muddled mess but assuming that isn't the case for purposes of argument, we still have multiple counts, and I think the [*Petrich*] instruction wasn't designed for that. Obviously, Your Honor is going to make the final decision, but I wanted to give you and the State the reason why I didn't put it in there and why I only put it in there when I have a one-count case but there's a possible six acts to choose from.

4 RP at 406.

17

> [THE COURT]: *You think it would be error to give 4.25?*
>
> [CARSON'S COUNSEL]: *I do.*

4 RP at 408-09 (emphasis added).

Consistent with this expression of trial strategy, Carson's counsel avoided discussing specific incidents in his closing argument and argued instead that CC's testimony and statements were so muddled, inconsistent, and confusing that they created a reasonable doubt about whether Carson had committed any of the acts or the charged crimes,

> [CARSON'S COUNSEL]: . . . But then on the testimony it was a jumbled mess of old house, new house, this bathroom. We had more than a dozen I-don't-knows and I-don't-remembers.
> [. . . .]
> It makes no sense. His testimony, this taped statement, is all over the place. It's an inconsistent, jumbled, confusing mess, and yet that's what the State wants you to believe beyond a reasonable doubt is the evidence that proves that my client is guilty beyond a reasonable doubt.
> [A]nd you see that this is as jumbled a mess as to what came from there.
> And the big question I think you need to ask yourselves in this case is, do I feel comfortable convicting three counts or of any count of a charge like this based on that, that jumbled, confusing mess?

4 RP at 450, 454-55, 457.

We hold that Carson's counsel's decision to oppose giving a *Petrich* instruction was a reasonable trial strategy to avoid jury confusion, that Carson fails to rebut the strong deferential presumption that counsel's performance was not deficient, and that consequently his ineffective

assistance of counsel argument fails.[22]

### III. STATEMENT OF ADDITIONAL GROUNDS

In his SAG, Carson asserts that (1) TH's testimonies at the child hearsay hearing and at trial were inconsistent, thus prejudicing him; and (2) in his interview with Thomas, CC identified another person known as "David." SAG at 1-2. These claims fail to require reversal.

Carson claims that during the child hearsay hearing, TH testified that when CC told her about Carson, she "kept driving to her friend[']s house"; but during the jury trial, TH testified that she "pulled over at a place and got out and called her [b]oyfriend." SAG at 2. Carson incorrectly mischaracterizes TH's testimony. Although TH testified at the child hearsay hearing that she had initially continued driving, she also testified that she had eventually stopped her

---

[22] Because we hold that Carson fails to show deficient performance, we do not address the prejudice prong of the ineffective assistance of counsel test. Both Carson and the dissent cite *Coleman* for the proposition that omission of a unanimity instruction is presumed to result in prejudice. But the presumption of prejudice in *Coleman* was in the context of harmless error analysis, not in the context of an ineffective assistance of counsel claim. *See Coleman*, 159 Wn.2d at 511. The presumption of prejudice in an ineffective assistance of counsel claim is limited to "the complete denial of counsel and comparable circumstances" such as (1) where a defendant "is denied counsel at a critical stage of his trial"; (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; (3) where the circumstances are such that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into [the] actual conduct of the trial"; and (4) where "counsel labors under an actual conflict of interest." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 674, 101 P.3d 1 (2004) (internal quotation marks and footnoted citations omitted) (quoting *Visciotti v. Woodford*, 288 F.3d 1097, 1106 (9th Cir.), *rev'd on other grounds*, 537 U.S. 19, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002)). Carson fails to show that any of these circumstances—comparable to "complete denial of counsel"—are present here. *See Davis*, 152 Wn.2d at 674. Therefore, there is no presumption of prejudice.

vehicle.[23] Contrary to Carson's claim, the record shows that TH's child hearsay hearing testimony was not inconsistent with her jury trial testimony.

Carson also appears to assert that CC identified the wrong defendant by alleging that during CC's forensic interview with Thomas, CC mentioned a "Mulkins," who happens to be "David" Mulkins. SAG at 1. Again, Carson mischaracterizes the record. The recording of this interview shows that when CC mentioned Mulkins, it was in response to Thomas's asking CC what his uncle's name was, to which CC responded, "David. . . . *My other* [*uncle*] *is Mulkins* and he doesn't do nothin' to me, he tried fights with me on Halo games."[24] When Thomas asked if "Uncle David" was the one who had put his penis in CC's bottom and twisted CC's business, CC nodded affirmatively.[25] The record thus shows that when CC mentioned Mulkins, he was merely distinguishing between his two uncles—"Uncle David" (Carson), who had molested him; and his other uncle, "Mulkins" (David Mulkins), who had *not* molested him.

---

[23] In Report of Proceedings (Vol. 1) at 61:
    [THE STATE]: Did you continue driving?
    [TH]: Yes.
    [THE STATE]: Was that difficult for you?
    [TH]: Yes.
    [THE STATE]: At some point did you stop the vehicle or pull over?
    [TH]: Yes.

[24] Pierce County Superior Court, Wash., Forensic Interview, Ex. 5, *supra*, at 13 min., 56 sec.,— 13 min., 57 sec. (emphasis added),

[25] Pierce County Superior Court, Wash., Forensic Interview, Ex. 5, *supra*, at 13 min., 57 sec.

Moreover, at trial, CC accurately identified Carson as "Uncle David," the perpetrator:

[THE STATE]: And who is David?
[CC]: My Uncle David.
[THE STATE]: Do you see your Uncle David anywhere in the courtroom today?
[CC]: Right there.
[THE STATE]: And, Your Honor, I would ask that the record reflect that the witness has identified the defendant.

2 RP at 103. This part of the record shows that even if CC knew another "David" in addition to Carson, CC accurately identified Carson as the person who had molested him. Contrary to Carson's assertions, nothing in the record supports Carson's allegation of mistaken identity.

We affirm.

Hunt, P.J.

I concur:

Penoyar, JPT.

21

No. 43359-1-II

WORSWICK, J. (dissenting) — I disagree with the majority's holding that David William Carson's counsel was not ineffective. In my opinion, defense counsel's decision to decline a *Petrich*[26] instruction cannot be characterized as a legitimate trial tactic, and, therefore, his performance was deficient. Further, counsel's error was prejudicial. Carson has met his burden to show ineffective assistance of counsel, and I disagree with the majority's opinion holding otherwise. Accordingly, I would reverse Carson's convictions for three counts of first degree child molestation.

## I. DEFICIENT PERFORMANCE

Defense counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). To overcome the presumption that counsel's performance was reasonable, counsel's conduct must be devoid of any conceivably legitimate trial strategy. *State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011). In some instances failing to request a jury instruction may be a legitimate trial tactic. *See State v. Yarbrough*, 151 Wn. App. 66, 90, 210 P.3d 1029 (2009) ("[F]ailure to request a limiting instruction for evidence admitted under ER 404(b) may be a legitimate tactical decision not to reemphasize damaging evidence."). Such is not the case here.

In Washington, defendants have a constitutional right to a unanimous jury verdict. *See State v. Badda*, 63 Wn.2d 176, 181-82, 385 P.2d 859 (1963). A *Petrich* instruction is necessary to protect a defendant's right to a unanimous jury verdict. *Petrich*, 101 Wn.2d at 569. When defense counsel rejected the proposed *Petrich* instruction, defense counsel unilaterally waived Carson's right to a unanimous verdict. Although a defendant may waive the right to a 12-person

---

[26] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).

jury, or to a jury altogether, a defendant may not waive his right to a unanimous verdict should the defendant elect a jury trial. *State v. Noyes*, 69 Wn.2d 441, 446, 418 P.2d 471 (1966) (When a hung jury stands 11 to 1 for acquittal, defendant is not permitted to waive a unanimous verdict and accept the vote of 11 jurors as a valid verdict.) Accordingly, defense counsel's waiver of Carson's right to a unanimous verdict is per se unreasonable.

Second, defense counsel declined the *Petrich* instruction under the mistaken belief that a *Petrich* instruction was unnecessary in this case. When asked about the *Petrich* instruction defense counsel stated:

> I didn't [propose a *Petrich* instruction], and the reason I didn't, obviously, from [C.C.'s] testimony it was all jumbled up. I don't know what happened, where, and new, old, or whatever, but from the videotape at some point there seemed to be three separate and distinct incidents, one in his room, one in his mother's room, and one in the bathroom.
>
> Normally *Petrich* instructions come up where the child talks about five or six incidents and one of them is charged, and then *Petrich* says, well, you have to agree on whatever act it is.
>
> Here, I didn't feel that there was a need for that because even though it was a jumbled mess, there were, at least, three separate and distinct incidents referred to, and I didn't think *Petrich* was necessary, but that's certainly the Court's discretion.

3 Report of Proceedings (RP) at 334-35. But defense counsel was mistaken. A *Petrich* instruction is required in cases where the State charges multiple counts based on "generic testimony" regarding prolonged and consistent sexual abuse. *State v. Hayes*, 81 Wn. App. 425, 430-31, 914 P.2d 788 (1996). In *Hayes*, Division One of this court stated:

> In sexual abuse cases where multiple counts are alleged to have occurred within the same charging period, the State need not elect particular acts associated with each count so long as the evidence "clearly delineate[s] specific and distinct incidents of sexual abuse" during the charging periods. The trial court must also instruct the jury that they must be unanimous as to which act constitutes the count

charged and that they are to find "separate and distinct acts" for each count when the counts are identically charged.

81 Wn. App. at 431 (footnotes omitted). Here, the State charged Carson with three counts of rape of a child. C.C.'s testimony establishes some distinct acts of sexual abuse, but also includes "generic testimony" regarding ongoing abuse. Therefore, a *Petrich* instruction was required. I cannot be convinced that basing a decision on an erroneous view of the law can be characterized as a *legitimate* trial tactic.

Third, defense counsel declined the *Petrich* instruction based on his assertion that the instruction would needlessly confuse the jury. Jury instructions are proper when they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law. *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). Therefore, it stands to reason that defense counsel may decline, or the trial court may reject, a jury instruction that is misleading. However, it is unreasonable to believe that the jury will be misled or confused by an instruction that is an accurate statement of applicable law required to protect a specific constitutional right. In my opinion, defense counsel's conduct is as unreasonable as declining a reasonable doubt instruction on the theory that the definition of reasonable doubt may confuse the jury.

Here, defense counsel's reasons for declining the *Petrich* instruction are fundamentally unreasonable. When defense counsel's actions are unreasonable or based on misunderstandings of the law, I do not believe they can be characterized as legitimate trial tactics or strategies. Accordingly, I would hold the defense counsel's performance was deficient.

## II. PREJUDICE

To prevail on his claim of ineffective assistance of counsel, Carson must also show prejudice. When the State presents evidence of multiple acts that could each form the basis of one charged crime, "either the State must elect which of such acts is relied upon for a conviction or the court must instruct the jury to agree on a specific criminal act." *State v. Coleman*, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). "Where there is neither an election nor a unanimity instruction in a multiple acts case, omission of the unanimity instruction is presumed to result in prejudice."[27] *Coleman*, 159 Wn.2d at 512.

"Failure to give the *Petrich* instruction, when required, violates the defendant's constitutional right to a unanimous jury verdict and is reversible error, unless the error is harmless." *State v. Bobenhouse*, 166 Wn.2d 881, 894, 214 P.3d 907 (2009) (citing *State v. Camarillo*, 115 Wn.2d 60, 64, 794 P.2d 850 (1990)). Specifically, in cases where the trial court failed to give a required *Petrich* instruction "the standard of review for harmless error is whether

---

[27] The State clearly chose not to elect. During the discussion regarding the *Petrich* instruction the State asserted:

> Your honor, I need to go back and look at the case law. My understanding of *Petrich* is the State needs to either elect a specific date, incident time per charge or if they failed to elect, a *Petrich* instruction is required.
> *We have not elected.* What we have done is we have charged three counts of identical offenses during the same period of time, so I, frankly, think, and I just wanted to speak with [defense counsel] about this to see if he and I were of like mind, I think [the *Petrich* instruction] is required, frankly, but that would be the only difference between my proposed [instructions] and the defense proposed [instructions].

3 RP at 335-36 (emphasis added). The State later confirmed that it was not electing during a second conversation regarding the use of the proposed *Petrich* instruction.

a 'rational trier of fact could find that each incident was proved beyond a reasonable doubt.'" *Camarillo*, 115 Wn.2d at 65 (quoting *State v. Gitchel*, 41 Wn. App. 820, 823, 706 P.2d 1091 (1985)).

Reviewing courts have held that failure to give a *Petrich* instruction is harmless when "the evidence presented was sufficient to establish that each crime had occurred, there was no conflicting testimony, and the victim provided specific detailed testimony." *Bobenhouse*, 166 Wn.2d at 894 (citing *Camarillo*, 115 Wn.2d at 70). Here, the victim did not provide specific detailed testimony. His testimony was vague, confusing, and, at times, inconsistent. Further, Carson testified and specifically denied the allegations of abuse. Accordingly, I am not convinced that the error was harmless beyond a reasonable doubt. Because the error was not harmless, this court presumes that the error was prejudicial to Carson, and he has met his burden under the second prong of the ineffective assistance of counsel test.

Carson is required to show both counsel's performance was deficient and counsel's deficient performance prejudiced him. Defense counsel's performance was deficient because he had no legitimate tactical reason to justify declining a *Petrich* instruction. Carson has also met his burden to show prejudice because the failure to give a *Petrich* is presumed to be prejudicial, and, here, the error was not harmless beyond a reasonable doubt. Therefore, I believe that Carson has met his burden to prove ineffective assistance of counsel and I would reverse.

Worswick, C.J.